IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC FRONTIER; FOUNDATION, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-01441 (ABJ) |
| | ) | |
| DEPARMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF DIANE M. JANOSEK**

I, DIANE M. JANOSEK, hereby declare and state:

1. I am currently the Deputy Associate Director for Policy and Records for the National Security Agency ("NSA" or "Agency"). I have served with NSA for 13 years, and prior to my current assignment, I held various leadership positions throughout the Agency. As the Deputy Associate Director of Policy and Records, I am responsible for the processing of all requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records.

2. In addition, I am a TOP SECRET classification authority pursuant to section 1.3 of Executive Order (E.O.) 13526 dated 29 December 2009 (75 Fed. Reg. 707). It is my responsibility to assert the FOIA exemptions over NSA information in the course of litigation. Through the exercise of my official duties, I have become familiar with the current litigation arising out of a request for information filed by the Plaintiff. The NSA received a consultation from the Department of Justice's National Security Division (NSD) because the responsive records contained NSA information or NSA equities.

3. The purposes of this declaration is to advise the Court that NSA withheld certain information, as set forth below, because it is properly exempt from disclosure under the FOIA based on Exemptions 1 and 3, 5 U.S.C. §§552(b)(1) and (3), respectively. This is so because the information is a currently and properly classified matter in accordance with E.O. 13526 and protected from release by statutes, specifically Section 6 of the National Security Agency Act of 1959, 50 U.S.C. §402 note (Pub. L. No. 86-36); 18 U.S.C. §798; and Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. §403-1(i)(1). The records at issue are the following:  a report titled "The Intelligence Community's Collection Programs Under Title VII of the Foreign Intelligence Surveillance Act" (hereinafter "the white paper"); a Joint Statement Before the Senate Select Committee on Intelligence, dated February 9, 2012; and a Joint Statement Before the House Permanent Select Committee on Intelligence, dated December 8, 2011 (hereinafter "the Joint Statements").[1]

## ORIGIN AND MISSION OF NSA

4. The NSA was established by Presidential Directive in 1952 as a separately organized agency within the Department of Defense under the direction, authority, and control of the Secretary of Defense.  NSA's foreign intelligence mission includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence (SIGINT) information, of which COMINT is a significant subset, for (a) national foreign intelligence purposes, (b)

---

[1] In the white paper that was withheld in its entirety, all of the information except for one paragraph, which contains the U.S. Government's analysis of the Foreign Intelligence Surveillance Court's ("FISC") opinions and memoranda that are responsive to items 1 and 2 of Plaintiff's FOIA request, was redacted based on a non-responsive determination, i.e., this information was not responsive to any of the three items in Plaintiff's FOIA request. Likewise, all of the information redacted in the two Joint Statements except for the information under the "Recent FISC Opinion" sections was based on a non-responsiveness determination. In these non-responsive sections, there is a significant amount of NSA information that would be exempt from release under the FOIA based on Exemptions 1 and 3 if this information were to be reviewed for release to the Plaintiff. This information contains classified and protected operational details on how NSA acquires foreign intelligence information under Section 702 of the FISA Amendments Act of 2008 (hereinafter "FAA Section 702" or "Section 702"), but does not at all relate to any FISC opinions, orders, or determinations on the U.S. Government's implementation of Section 702.

counterintelligence purposes, and (c) the support of military operations. *See* E.O. 12333, section 1.7(c), as amended.

5. In performing its SIGINT mission, NSA exploits foreign electromagnetic signals to obtain intelligence information necessary to the national defense, national security, or the conduct of foreign affairs. NSA has developed a sophisticated worldwide SIGINT collection network that acquires, among other things, foreign and international electronic communications. The technological infrastructure that supports the NSA's foreign intelligence information collection network has taken years to develop at a cost of billions of dollars and untold human effort. It relies on sophisticated collection and processing technology.

## IMPORTANCE OF SIGINT TO THE NATIONAL SECURITY

6. There are two primary reasons for gathering and analyzing intelligence information. The first, and most important, is to gain the information required to direct U.S. resources as necessary to counter threats. The second reason is to obtain the information necessary to direct the foreign policy of the United States. Foreign intelligence information provided by the NSA is routinely distributed to a wide variety of senior Government officials, including the President; the President's National Security Advisor; the Director of National Intelligence; the Secretaries of Defense, State, Treasury and Commerce; U.S. ambassadors serving in posts abroad; the Joint Chiefs of Staff; and the Unified and Specified Commanders. In addition, SIGINT information is disseminated to numerous agencies and departments, including, among others, the Central Intelligence Agency; the Federal Bureau of Investigation; the Drug Enforcement Administration; the Departments of the Army, Navy, and Air Force; and various intelligence components of the Department of Defense. Information provided by NSA is relevant to a wide range of important issues, including, but not limited to, military order of battle; threat warnings and readiness; arms

proliferation; terrorism; and foreign aspects of international narcotics trafficking.  This information is often critical to the formulation of U.S. foreign policy and the support of U.S. military operations around the world.  Moreover, intelligence produced by NSA is often unobtainable by other means.

7. NSA's ability to produce foreign intelligence information depends on its access to foreign and international electronic communications.  Further, SIGINT technology is both expensive and fragile.  Public disclosure of either the capability to collect specific communications or the substance of the information itself can easily alert targets to the vulnerability of their communications.  Disclosure of even a single communication holds the potential of revealing the intelligence collection techniques that are applied against targets around the world.  Once alerted, SIGINT targets can easily frustrate SIGINT collection by using different or new encryption techniques, disseminating disinformation, or by utilizing a different communications link.  Such evasion techniques may inhibit access to the target's communications and, therefore, deny the United States access to information crucial to the defense of the United States both at home and abroad.

## NSA'S IMPLEMENTATION OF SECTION 702

8. NSA's SIGINT operations, to include those undertaken pursuant to Section 702, are sensitive and fragile.  The critical intelligence information that is derived from SIGINT operations depends upon the collection of electronic communications, which can be easily compromised if targets are aware of the U.S. Government's foreign intelligence capabilities and priorities.  Such capabilities and priorities would be revealed by disclosing the operational details of NSA's activities under FAA Section 702. Our adversaries know how they communicate, and if details on how NSA collects communications under FAA Section 702 were revealed, then our

adversaries could accurately extrapolate what types and methods of communications are vulnerable to collection under FAA Section 702. Such targets, if they learn or suspect that their signals are or may be targeted by the NSA for collection, can take steps to evade detection, to manipulate the information that NSA receives, or to implement countermeasures aimed at undermining NSA's operations. The resulting loss of accurate foreign intelligence from these sources would deprive U.S. policy makers of information critical to U.S. interests.

9. All responsive information withheld in the two Joint Statements (the "Recent FISC Opinion" sections) was based on Exemptions 1 and 3 of the FOIA because the information is currently and properly classified TOP SECRET//SI//NOFORN[2] in accordance with E.O. 13526 and/or protected from release by cognizable Exemption 3 statutes, which in this case are Public Law 86-36, 50 U.S.C. §403-1(i) and 18 U.S.C. §798. The material withheld provides extensive insight into how NSA collects communications under FAA Section 702 as analyzed and discussed by the FISC. Likewise, the one responsive paragraph in the white paper withheld by NSA pertains to NSA's implementation of FAA Section 702 as analyzed and discussed by the FISC. All of this information is classified TOP SECRET//SI//NOFORN, and is thus exempt based on Exemptions 1 and 3 of the FOIA. NSA's justification for withholding this information is set forth below.

---

[2] Special intelligence (SI) is also referred to as communications intelligence (COMINT), but the COMINT marking is no longer used to denote communications intelligence. Rather, the SI marking is now used. SI is a subcategory of Sensitive Compartmented Information ("SCI"), which is "information that not only is classified for national security reasons as Top Secret, Secret, or Confidential, but also is subject to special access and handling requirements because it involves or derives from particularly sensitive intelligence sources and methods." 28 C.F.R. § 17.18(a). Because of the exceptional sensitivity and vulnerability of such information, these special safeguards and access requirements exceed the access standards that are normally required for information of the same classification level. SI identifies SCI that was derived from exploiting cryptographic systems or other protected sources by applying methods or techniques, or from intercepted foreign communications.

## DOJ NSD's REFERRAL OF DOCUMENTS TO THE NSA THAT WERE RESPONSIVE TO THE PLAINTIFF'S FOIA REQUEST TO THE DOJ

10.  By letter dated July 26, 2012, Plaintiff submitted a FOIA request to the Department of Justice for records regarding the FAA.  Plaintiff specifically sought the following records:  (1) Any written opinion or order, as described in the statement quoted in this request, in which "the Foreign Intelligence Surveillance Court held that some collection carried out pursuant to the section 702 minimizations procedures used by the Government was unreasonable under the Fourth Amendment"; (2) Any written opinion or order, as described in the statement quoted in the request, reflecting or concerning a FISC determination that "the government's implementation of Section 702 of FISA has sometimes circumvented the spirit of the law"; and (3) Any briefing provided to the Senate Select Committee on Intelligence or the House Permanent Select Committee on Intelligence concerning the FISC opinion or orders, described in items (1) and (2) of the request.

11.  In response to the Plaintiff's FOIA request, the Department of Justice's National Security Division ("NSD") consulted with NSA seeking NSA's review of responsive documents because they contained NSA information.  The NSA withholdings that are described within this declaration, and the justification for these withholdings contained herein, pertain to a document titled "The Intelligence Community's Collection Program Under Title VII of the Foreign Intelligence Surveillance Act" ("the white paper"); a Joint Statement before the House Permanent Select Committee on Intelligence dated December 8, 2011; and a Joint Statement before the Senate Select Committee on Intelligence dated February 9, 2012 ("Joint Statements"), and in particular, to only the information that is responsive to Plaintiff's request, which is the U.S. Government's analysis of the FISC's memorandum.  The NSD will justify the U.S.

Government's withholdings of the FISC opinions and memoranda in their entirety.  However, the NSA information in the FISC opinions and memoranda is exempt in its entirety for the very same reasons that the Government's analysis of these opinions and memoranda is exempt from release based on Exemptions 1 and 3 as explained in this declaration.

12.  NSA responded to the DOJ's consultation and redacted certain classified and protected NSA information in the white paper while noting that there is classified U.S. Government information throughout the document.  Likewise, NSA redacted certain classified and protected NSA information in the two Joint Statements.  Overall, NSA withheld the responsive information in the two Joint Statements and the white paper, because the information is currently and properly classified in accordance with E.O. 13526 and protected from release by statute, specifically, 50 U.S.C. §402 note (P.L. 86-36); 50 U.S.C. §403-1(i); and 18 U.S.C. §798. Accordingly, this information is exempt from release based on Exemptions 1 and 3 of the FOIA as set forth below.

## FOIA EXEMPTION ONE

13.  Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized - under criteria established by an Executive Order - to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order.  The current Executive Order that establishes such criteria is E.O. 13526.

14.  Section 1.4 of E.O. 13526 provides that national security information shall not be considered for classification unless it falls within one (or more) of eight specifically enumerated categories of information.  The categories of classified information in the documents at issue here are those found in Section 1.4(c), which include intelligence activities (including covert

action), intelligence sources and methods, or cryptology; and Section 1.4(g), which include

vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or

protection services relating to the national security.

15.  In my role as a TOP SECRET classification authority, I have reviewed the two Joint

Statements and the white paper forwarded to NSA for consultation by NSD because they

originated with NSA and/or contained NSA equities.  For the following reasons, I have

determined that all of the responsive information withheld by NSA is currently and properly

classified at the TOP SECRET- SENSITIVE COMPARTMENTED INFORMATION (SCI) and

SECRET levels in accordance with E.O. 13526.  Accordingly, the release of this information

could reasonably be expected to cause exceptionally grave damage and serious damage,

respectively, to the national security.  Additionally, this information is subject to special access

and handling restrictions, because it involves sensitive compartmented information.

16.  The information withheld in the two Joint Statements and the white paper pertains to

operational details of NSA's collection activities under Section 702 of the FAA.  The release of

this information would reveal information about NSA's success or lack of success in its

acquisition efforts under the FAA.  The disclosure of NSA's ability or lack of ability to collect

intelligence under the FAA would reveal information about the U.S. Intelligence Community's

capabilities, priorities, and activities.  The disclosure of this information could reasonably be

expected to cause exceptionally grave damage to the national security, because it would provide

our nation's adversaries information about the nature and frequency of the Government's use of

specific techniques that could assist them in undermining the NSA's and the Intelligence

Community's national security mission.

17. Targeted persons have been known to analyze public disclosures of NSA's capabilities. Therefore, the public disclosure of either NSA's capability to acquire communications or the frequency with which such information is acquired can easily alert targets to the vulnerability of their communications. Targeted persons know how they communicate, and therefore, would know, upon a disclosure of NSA's capabilities under FAA Section 702, which of their communications are vulnerable to NSA's surveillance (and, vice versa, which of their communications are not vulnerable). Once alerted, targets can frustrate SIGINT collection by using different communication techniques; or by utilizing a different communications link or facility. This may result in denial of access to targets' communications and therefore result in a loss of access to information crucial to the national security and defense of the United States.

18. Thus, disclosing any operational details of NSA's activities under the FAA would provide our adversaries with critical information about the capabilities and limitations of the NSA, such as the types of communications that may be targeted and acquired by NSA. For this reason, any operational details of NSA's acquisition efforts under the FAA are exempt from disclosure pursuant to Exemption 1 of the FOIA because the information is currently and properly classified in accordance with E.O. 13526.

## (U) FOIA EXEMPTION THREE

19. Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempted from disclosure by statute, provided that such statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matter to be withheld. *See* 5 U.S.C. § 552(b)(3). Review of the application of Exemption 3

statutes consists solely of determining that the statute relied upon qualifies as an Exemption 3

statute and that the information withheld falls within the scope of the statute.

20. The responsive information at issue here falls squarely within the scope of several

statutes. The first of these statutes is a statutory privilege unique to NSA. As set forth in section

6 of the National Security Agency Act of 1959 ("NSA Act"), Public Law 86-36 (50 U.S.C. § 402

note), "**[n]othing in this Act or any other law . . . shall be construed to require the disclosure**

**of the organization or any function of the National Security Agency, [or] of any**

**information with respect to the activities thereof. . . .** " (emphasis added). Congress, in

enacting the language in this statute, decided that disclosure of any information relating to NSA

activities is potentially harmful. *Hayden v. NSA,* 608 F.2d 1381, 1390 (D.C. Cir. 1979); *see also*

*Wilner v. NSA,* 592 F.3d 60, 75 (2nd Cir. 2010); *Larson, et al. v. Department of State,* 565 F.3d

857, 868 (D.C. Cir. 2009); *Students Against Genocide, et al. v. Department of State, et al.,* 257

F.3d 828 (D.C. Cir. 2001); *Lahr v. National Transp. Safety Bd., et al.,* 453 F. Supp.2d 1153,

1171-73 (C.D. Cal. 2006); *People for the American Way v. NSA,* 462 F.Supp.2d 21, 30 (D.D.C.

2006), *Florida Immigrant Advocacy Center v. NSA,* 380 F.Supp.2d 1332, 1340-41 (S.D. Fla.

2005). Federal courts have held that the protection provided by this statutory privilege is, by its

very terms, absolute. *See, e.g., Linder v. NSA,* 94 F. 3d 693 (D.C. Cir. 1996). Section 6 states

unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be

compelled to disclose any information with respect to its activities. *See Hayden,* 608 F.2d at

1389. Further, while in this case the harm would be very exceptionally grave or serious, NSA is

not required to demonstrate specific harm to national security when invoking this statutory

privilege, but only to show that the information relates to its activities. *Id.* at 1390. To invoke

this privilege, NSA must demonstrate only that the information it seeks to protect falls within the

scope of Section 6.  NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

21.  The second applicable statute is 18 U.S.C. § 798.  This statute prohibits the unauthorized disclosure of classified information: (i) concerning the communications intelligence activities of the United States; or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government.  The term "communications intelligence," as defined by 18 U.S.C. § 798(b), means all procedures and methods used in the interception of communications and the obtaining of information from such communications by other than the intended recipients.

22.  The third applicable statute is Section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, 50 U.S.C. § 403-1(i)(1), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  NSA, as a member agency of the U.S. Intelligence Community, must also protect intelligence sources and methods.  Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods is absolute.  *See Central Intelligence Agency v. Sims*, 471 U.S. 159 (1985).  Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by 50 U.S.C. § 403-l(i)(1).  *Id.*

23.  As described above, Congress has enacted three statutes to protect the fragile nature of NSA's SIGINT efforts, to include but not limited to, the existence and depth of signals intelligence-related successes, weaknesses and exploitation techniques.  These statutes recognize the vulnerability of signals intelligence to countermeasures and the significance of the loss of valuable intelligence information to national policymakers and the Intelligence Community.

Given that Congress specifically prohibited the disclosure of information related to NSA's functions and activities and its communications intelligence activities, as well as the sources and methods used by the Intelligence Community as a whole, I have determined that NSA's SIGINT activities and functions, and its intelligence sources and methods would be revealed if any of the withheld information about the FISC's orders and memoranda were disclosed to the Plaintiff.

24.   Based upon my review of the responsive NSA material, I conclude that the information that was withheld (and continues to be withheld) is protected from disclosure by statute pursuant to the following three authorities: (1) Section 6 of the NSA Act of 1959 (Pub. L. 86-36) (50 U.S.C. § 402 note), because the information concerns the organizations, function and activities of the NSA as described above; (2) 18 U.S.C. § 798, because disclosure would reveal classified information derived from NSA's exploitation of foreign communications; and (3) 50 U.S.C. § 403-1(i)(1), because the information concerns intelligence sources and methods.

25.   The withheld information reveals certain operational details on how NSA acquires communications under Section 702 of the FAA.  The acquisition of such communications clearly relates to a function or an activity of the NSA.  The withheld information also directly pertains to one of NSA's core missions, SIGINT collection.  Finally, the withheld information pertains to the communications intelligence activities of the NSA.  Accordingly, all of the withheld information is exempt from release under the FOIA pursuant to Exemption 3.

26.   As indicated above, NSA's withholdings in this case were appropriate and consistent with the FOIA's requirements under the circumstances.  The Court can justify all of the NSA's withholdings in these documents based on Exemption 3 alone pursuant to Section 6 of the NSA Act of 1959 as the withheld information relates to "any function" of the NSA and "information with respect to [NSA's] activities" in furtherance of its SIGINT mission.  Congress expressly

protected such information from disclosure in Section 6 of the NSA Act of 1959, and therefore,

Exemption 3 serves to ensure that congressional judgment is not implicitly overridden by the

FOIA. *See Association of Retired R.R. Workers v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 336

(D.C. Cir. 1987) ("[T]he purpose of Exemption 3 [is] to assure that Congress, not the agency,

makes the basic nondisclosure decision."); *Founding Church of Scientology of Washington, DC*

*v. NSA*, 610 F.2d 824, 828 (D.C. Cir. 1979) ("Section 6 . . . reflects . . . a congressional

judgment that, in order to preserve national security, information elucidating the subjects

specified ought to be safe from forced exposure. The basic choice was made by Congress, not

entrusted to administrative discretion in the first instance."). For the reasons set forth above, all

of the withheld information is likewise exempt based on Exemption 1 of the FOIA because the

information is currently and properly classified in accordance with E.O. 13526.

27. I declare under penalty of perjury that the facts set forth above are true and correct.

Executed, this ___22nd___ day of March 2013, pursuant to 28 U.S.C. § 1746.


_____
DIANE M. JANOSEK
Deputy Associate Director for Policy and Records
National Security Agency